# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Geraldine Soat Brown | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 4084 | **DATE** | 9/26/2002 |
| **CASE TITLE** | Shapo vs. Underwriters Mgt | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐  Filed motion of [ use listing in "Motion" box above.]

(2) ☐  Brief in support of motion due _____.

(3) ☐  Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐  Ruling/Hearing on _____ set for _____ at _____.

(5) ☐  Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐  Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐  Trial[set for/re-set for] on _____ at _____.

(8) ☐  [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐  This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
       ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■  [Other docket entry]  For the reasons set out in the Memorandum Opinion and Order, the Plaintiff's motion for partial summary judgment [58-1] is granted in part and denied in part. Plaintiff's motion for summary judgment on Count I of the Amended Complaint is GRANTED. Plaintiff's motion for summary judgment on Defendants' counterclaim is DENIED. Defendants' motion for summary judgment [54-1] is DENIED. This case is set for status hearing on 10/10/02 at 9:45 a.m. to set date for trial on remaining claims *Geraldine Soat Brown*

(11) ■  [For further detail see order attached to the original minute order.]

| | | | | | | |
|---|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | number of notices | **Document Number** |
| | No notices required. | | | | SEP 2 7 2002 | |
| ✓ | Notices mailed by judge's staff. | | | | | |
| | Notified counsel by telephone. | | | | date docketed | |
| | Docketing to mail notices. | | | | *lcw* | |
| | Mail AO 450 form. | | | | docketing deputy initials | 77 |
| ✓ | Copy to judge/magistrate judge. | | | U.S. DISTRICT COURT | 9/26/2002 | |
| JD | courtroom deputy's initials | | CLERK 02 SEP 26 PM 3: 35 | date mailed notice | |
| | | | U Date/time received in central Clerk's Office | JD6 | |
| | | | | mailing deputy initials | |



SEP 2 7 2002

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| NATHANIEL SHAPO )<br>         **Plaintiff,** )<br>)<br>      **v.** )<br>)<br>UNDERWRITERS MANAGEMENT )<br>CORPORATION, et al. )<br>         **Defendants.** ) | Cause No. 98 C 4084<br><br>Magistrate Judge Geraldine Soat Brown |

## MEMORANDUM OPINION AND ORDER

This case comes before the court on Plaintiff's motion for partial summary judgment [dkt 58] and Defendants' motion for summary judgment on Count I of the Amended Complaint [dkt 54]. For the reasons that follow, Plaintiff's motion is GRANTED in part and DENIED in part, and Defendants' motion is DENIED.

## FACTUAL BACKGROUND[1]

This case arises out of a series of transactions in 1992 and 1993 involving Prestige Casualty Company ("Prestige"), a financially troubled Illinois casualty insurance company, and defendant Norman Meier and the companies in which he had interests, Underwriters Management Corporation (the other named defendant in this case), Hallmark Holding Group, Fargo Acceptance Corporation,

---

[1] The following facts are taken from the parties' responses to the other party's respective statements filed pursuant to Local Rule 56.1, which responses are cited herein as "Defs.' Resp." and "Pl.'s Resp." [dkt 65], and from the appendices of exhibits submitted with the statements and in support of the parties' motions for summary judgment, which are cited herein as "Pl.'s App." [dkt 59] and "Defs.' App." [dkt 67], and "Defs.' Exs." [dkt 55].

and Columbia Laboratories, Inc.[2] Prestige was placed in liquidation by the Illinois Department of Insurance in June 1994. Plaintiff Nathaniel Shapo ("Plaintiff") is the Acting Director of Insurance of the State of Illinois, and is the liquidator of Prestige. (Defs.' Resp. ¶ 1.)

## THE ACQUISITION OF HALLMARK AND
## CONTRIBUTION OF COLUMBIA LAB STOCK

On September 30, 1992, Meier and a group of ten other individuals acquired 100% of Hallmark Holding Group, Inc. ("Hallmark") from Sam Hakemian (now deceased). (Defs.' Resp. ¶ 9.) Hallmark's assets included Prestige. (*Id.*) As part of the Hallmark acquisition, Meier agreed to contribute 100,000 shares of Columbia Laboratories, Inc. ("Columbia Lab"), common stock to Fargo Acceptance Corporation ("Fargo"), a premium finance company. (Defs.' Resp. ¶ 11.) In addition, John Kidd, the spouse of one of the other Hallmark investors, contributed 250,000 shares of Columbia Lab stock to Fargo. (*Id.*) The purpose of Meier's contribution of Columbia Lab stock (and presumably Kidd's contribution) was to increase the net capital of financially-struggling Prestige by enhancing the balance sheet of its wholly-owned subsidiary Fargo. (Pl.'s Resp. ¶ 12.) In a corrective order issued in December, 1992, the Director of the Illinois Department of Insurance stated that the contribution of Columbia Lab stock was made at the time of the acquisition "to Prestige . . .through Prestige's wholly-owned subsidiary, Fargo Acceptance Company," and that without that contribution, Prestige's surplus would be impaired by approximately $450,000. (Pl.'s

---

[2] Norman Meier was the Chief Executive Officer, President and one of two founding shareholders of Columbia Laboratories Inc. (Pl.'s App., Ex. 33.) Meier was a director of both Prestige and Fargo from approximately December 15, 1992 until his resignation effective September 1, 1994. (Pl.'s App., Exs. 16-19, 37.) Meier was the sole shareholder, director and officer of Underwriters Management Corporation. (Pl.'s App., Ex. 1 at 74.) Meier was one of eleven investors who purchased Hallmark in 1992. (Pl.'s App., Ex. 14.)

App., Ex. 27.)

As part of the transaction, Meier and the other Hallmark investors executed a Contribution Agreement dated September 30, 1992. (Pl.'s App., Ex. 15.) The Contribution Agreement recites that certain of the investors (referred to as Capital Investors) have contributed to the surplus of Prestige and other investors (referred to as Non-Capital Investors) are contributing their expertise. (*Id*. at 1-2.) It provides that Capital Investors shall be repaid the value of their contributions prior to Non-Capital Investors receiving any dividends or distribution of gain from Hallmark. (*Id*. at 2.) The Contribution Agreement contains an integration clause reciting that it constitutes the entire understanding of the parties and merges all prior understandings oral or written. (*Id*. at 3.)

## THE CALL OPTION AGREEMENT

Meier contends that he contributed the shares of the Columbia Lab stock pursuant to a September 30, 1992 Agreement ("Call Option Agreement") that would permit Meier to reacquire the shares at a later date if they were to appreciate to a level equal to 140% of their value. (Defs.' App., Ex. 4 at 56-59; Ex. 5.) Plaintiff contests the authenticity, validity and enforceability of the Call Agreement. The Call Option Agreement bears a signature purporting to be that of Lisa Gisler in the capacity of Vice President of Fargo. Under the Call Option Agreement, Meier's option expired on September 30, 1997. (Defs.' App., Ex. 5.)

## THE PROMISSORY NOTE

Meier needed funds to pay the exercise price of the Columbia Lab stock option that permitted him to contribute shares to Fargo and to pay tax liabilities that would be incurred by exercising the option. (Pl.'s App., Ex. 1 at 28-29.) To obtain the needed funds, on or about September 24, 1992,

3

Meier, in his capacity as president of Underwriters Management Corporation, executed a Promissory Note (the "Note") issued to Prestige for a principal amount of $200,000. (Pl.'s App., Ex. 22; Ex. 1 at 30-31, 33-34.) The Note provides that it is payable with interest at 8.5% on September 5, 1995, and is to be construed and enforced in accordance with New York law. (Pl.'s App., Ex. 22.)

Meier is the sole shareholder, officer and director of Underwriters, and Underwriters was created for the purpose of carrying out the transaction on the Note and making the investment of Columbia Lab shares in Prestige. (Pl.'s App., Ex. 1 at 37-38, 74.) Prestige transferred $200,000 to Underwriters, which Meier then used to reimburse himself for the cost of exercising the Columbia Lab stock option and to cover his personal tax liability. (Pl.'s App. Ex., 1 at 37-43, 50-54.) Neither Meier nor Underwriters paid the principal and interest due on the Note on September 5, 1995. (Pl.'s App., Ex. 1 at 67-68.) In June 1993, ownership of the Note was transferred from Prestige to Fargo as consideration for the transfer of approximately 118,000 shares of Columbia Lab stock from Fargo to Prestige. (Defs.' Exs., Exs. N, O.)

## CORRECTIVE ORDERS

As part of an effort to avoid the liquidation of Prestige and actions potentially harmful to its policyholders, the Department of Insurance issued Corrective Order No. 01-93 on February 4, 1993.[3] Corrective Order No. 01-93 required that "Prestige shall take whatever measures necessary to ensure that Fargo does not sell, transfer, trade, convert or otherwise dispose of the 350,000 shares of Columbia Laboratories, Inc. common stock held in Fargo's name, regardless of whether such actions

---

[3] Corrective Order No. 01-93 superseded Corrective Order No. 01-92, and reflects changes in the language negotiated between the Department of Insurance and Norman Koefoed, who at the time was the president and CEO of Prestige. (Defs.' Resp. ¶ 57; Pl.'s App., Ex. 29.)

may be required by prior agreement, without the prior express written permission of the Director or his designee." (Pl.'s App., Ex. 32 ¶ 2.) Corrective Order No. 01-93 further stated that "[n]otwithstanding the foregoing, the transfer of shares of Columbia Laboratories directly to Prestige does not require prior written permission." (*Id.*)

## THE LIQUIDATION

Prestige, however, could not avoid liquidation, and on June 10, 1994, Plaintiff filed a Verified Complaint for Liquidation with a Finding of Insolvency of Prestige in the Circuit Court of Cook County. (Pl.'s App., Ex. 10.) On July 26, 1994, that court entered an Order of Liquidation with a Finding of Insolvency against Prestige. (*Id.*)

The Order of Liquidation authorized Plaintiff to

"marshall [sic] and liquidate the assets of Prestige pursuant to the provisions of Article XIII of the Insurance Code, 215 ILCS 5/187 *et seq.*, . . . and further that the Director is hereby vested as Liquidator with title to all property, contracts and rights of action of the Defendant, Prestige, and that he is hereby authorized to deal with the property, books, records, accounts, business, affairs, and other assets of Prestige and to sue and defend for Prestige, or for the benefit of Prestige's policyholders, stockholders, and creditors in his name as Liquidator of Prestige, or in the name of the Company."

(Pl.'s App., Ex. 10 ¶ B.) Plaintiff claims that one of the assets it gained control over via the Order of Liquidation was Fargo, the wholly-owned affiliate of Prestige and, in turn, its assets, which included the Note and the Columbia Lab shares. (Pl.'s App., Ex. 20 at 5, 18.)

On August 16, 1994, Meier sent a letter to Plaintiff's counsel inquiring about reclaiming the Columbia Lab stock that he had contributed to Fargo. (Pl.'s App., Ex. 33.) In his letter, Meier stated that in return for the contribution of the shares, he had expected to receive a significant percentage of the proceeds of a sale of Prestige as well as the return of the shares at the time of the sale. (*Id.* at

5

2.) On August 24, 1994, Meier sent a letter offering to purchase the entire 350,000 shares of Columbia Lab stock that he and Kidd had contributed to Prestige on September 30, 1992 at a price of $2.86 per share, for a total of $1 million. (Pl.'s App., Ex. 34.)

Counsel for Plaintiff declined Meier's offer, stating that it was substantially below market price. (Pl.'s App., Ex. 35.) Plaintiff stated that it would entertain a higher offer from Meier, but that as the situation presently stood, had determined that "the Prestige estate would be better served by seeking to sell the stock on the open market." (*Id.*) Plaintiff also inquired about the status and financial condition of Underwriters, in order to obtain information about its ability to satisfy the terms of the Note. (*Id.*)

On October 31, 1994, Meier responded to Plaintiff's rejection by stating that he would "continue to explore financial avenues towards [sic] obtaining back some or all of the shares." (Pl.'s App., Ex. 36.) Meier also represented that Underwriters would be able to satisfy the Note at its maturity. (*Id.*) On or about November 21, 1995, Plaintiff sold the Columbia Lab shares on the open market at $7.17 per share, for a total of $2,509,738. (Pl.'s App., Ex. 40.)

In July, 1997, Plaintiff made a demand on Meier for payment of the Note. (Defs.' Exs., Ex. J.) In response, Meier informed Plaintiff that he planned to exercise his call option with respect to the Columbia Lab shares pursuant to the September 30, 1992 Call Option Agreement. (Defs.' Exs., Ex. K.) The price of the shares under the Call Option was approximately $7.35 per share, and Meier indicated that he was prepared to offer $735,000 to the holder of the stock. (*Id.*) Plaintiff replied that the shares had already been transferred out of Fargo to Prestige and then sold to a third party. (Pl.'s Resp. ¶ 15.)

# PROCEDURAL HISTORY

On April 3, 1998, Plaintiff filed in state court a Petition to Collect on the Promissory Note against Underwriters and Meier both individually and doing business as Underwriters. (Meier and Underwriters are collectively referred to herein as "Defendants.") (Defs.' Exs., Ex. D.) On July 2, 1998, Defendants filed a notice of removal to federal court pursuant to 26 U.S.C. § 1441, *et seq.* [Dkt 1.] Removal was based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a) because Plaintiff, the Acting Director of Insurance for the State of Illinois, is an Illinois government official with his principal place of business in Chicago, Illinois. (*Id.* ¶ 8.) Defendant Meier is a resident of Florida, and Defendant Underwriters Management Corporation was organized under Florida law, and has its principal place of business in Hollywood, Florida. (*Id.*)

On October 19, 1998, Plaintiff filed his Amended Compliant against Defendants, alleging a breach of the Note in Count I. (Defs.' Exs., Ex. A ¶¶ 9-18.)[4] Plaintiff alleges, *inter alia*, that Meier should be held individually liable for the Note because Underwriters was his alter ego, was not a valid, registered corporation, was not adequately capitalized, did not maintain and file corporate records, and was insolvent at the time the Note was executed. (Defs.' App., Ex. A ¶ 12.)

Meier in turn launched affirmative defenses and a counterclaim against Plaintiff. (Defs.' Exs., Ex. M at 13-20.) Meier's counterclaim alleges that Plaintiff tortiously caused Fargo to breach its Call Option Agreement with Meier; that Plaintiff was unjustly enriched by the retention of the Columbia Lab shares; that Plaintiff converted the Columbia Lab shares; and that Plaintiff effected a fraudulent transfer of the Columbia Lab Shares from Fargo to Prestige. (*Id.* at 16-20) Further,

---

[4] The Amended Complaint also alleges claims of breach of fiduciary duty and fraudulent misrepresentation against Meier, and unjust enrichment against both Defendants. (Defs.' Exs., Ex. A ¶¶ 19-23.)

7

Meier asserts affirmative defenses of set off (alleging that any damages claimed by Plaintiff on the Note must be set off by the damages Meier alleges that he incurred in excess of $1 million as a result of Plaintiff's failure to satisfy the call option); and laches or estoppel against Plaintiff's unjust enrichment claim. (*Id.* at 13.)

In the present motions, Plaintiff seeks summary judgment in its favor on Count I for breach of the Note against Meier personally and against Underwriters, and summary judgment on each of the Defendants' affirmative defenses and counterclaim. Defendants move for summary judgment in their favor on Count I on the ground that Plaintiff lacks standing to enforce the Note because it was transferred by Prestige to Fargo.

## LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of material fact exists, the court must construe all facts and draw all reasonable and justifiable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). When cross-motions for summary judgment are filed, the same standard is applied to each motion. *Stimsonite Corp. v. NightLine Markers, Inc.*, 33 F. Supp. 2d 703, 705 (N.D. Ill. 1999) (Shadur, J.).

The court "is not required to draw unreasonable inferences from the evidence." *St. Louis N. Joint Venture v. P & L Enters., Inc.*, 116 F.3d 262, 265 n. 2 (7th Cir. 1997). The initial burden is on the moving party to demonstrate, "with or without supporting affidavits," the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's

favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met the initial burden, the opposing party must support its contentions with admissible evidence and may not rest upon the mere allegations in the pleadings or conclusory statements in affidavits. *Id.* at 324. The non-moving party must designate specific facts showing that there is a genuine issue for trial. *Id.* It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the non-moving party bears the responsibility of identifying the evidence upon which it relies. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). "[N]either 'the mere existence of some alleged factual dispute between the parties'. . . nor the existence of 'some metaphysical doubt as to the material facts,' is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997)(quoting *Anderson*, 477 U.S. at 247 and *Matsushita Electrical Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).[5]

## I.     THE PROMISSORY NOTE

### A.     Meier's Personal Liability for the Note

There is no dispute that no amount has ever been paid by Underwriters or Meier of the

---

[5]     The parties' respective responses to the other side's statement of facts violate Local Rule 56.1 of the Northern District of Illinois. In many instances the parties submitted arguments instead of concise admissions or denials of the facts stated. *See, e.g.*, Defendants' Response to Plaintiff's Statement ¶¶ 10, 16, 31; Plaintiff's Response to Defendants' Statement ¶¶ 9, 11, 20. This Court requires compliance with that Local Rule. *See* Court's Case Management Procedures, available on the website for the Northern District of Illinois, www.ilnd.uscourts.gov. *See also Metropolitan Life Ins. Co. v. Johnson*, 297 F.3d 558, 562 (7th Cir. 2002)("[W]e have emphasized the importance of local rules and 'have consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment.'")(internal citation omitted). If a party's failure to follow the rules results in the Court adopting a version of the facts that is perhaps not as favorable to that party, that party is bearing the consequence of its own actions. *Metropolitan Life*, 297 F.3d at 562.

principal or interest on the Note. (Defs.' Resp. ¶¶ 23, 24.) Rather, Defendants claim that they have defenses to their liability on the Note, discussed below.

In his motion for partial summary judgment, Plaintiff argues that no genuine issue of material fact exists as to whether Meier is individually and personally responsible for repayment of the Note. Plaintiff contends that piercing the corporate veil of Underwriters Management Corporation is appropriate here because Meier created and used Underwriters as his alter ego or conduit for personal business. *See Pro-Line Corp. v. Midwest Hair Goods Co.*, 600 F. Supp. 770, 772 (N.D. Ill. 1985) ("An officer of a corporation will be considered the *alter ego* of the corporation where there is such unity of interest and ownership that the separateness of the individual and corporation has ceased to exist.") (internal quotations omitted). It is undisputed that Meier created Underwriters for the sole purpose of executing the Note, which would allow him to contribute the Columbia Lab shares to Fargo by providing him with funds to pay the exercise option and to cover his personal tax liability. (Pl.'s App., Ex. 1 at 37-43, 50-54). Meier used the proceeds of the Note to reimburse himself for his personal expenses, and is the sole shareholder, officer and director of Underwriters. (*Id.*) As such, Plaintiff contends, Meier should be held individually and personally liable for the Note.

In his submissions to the Court, Meier does not dispute either his identification with Underwriters or his personal responsibility for the Note. (Defs.' Resp. ¶ 7.) Further, at his deposition, Meier testified that: "Underwriters Management Corporation for all intents and purposes was me, and I was standing behind it and I had the assets to do it. . . . I have never not acknowledged the fact that I owed that money." (Pl.'s App., Ex. 1 at 81-82.) Here, no genuine issue of material fact exists with regard to Meier's personal liability on the Note. *See Salamon v. Messina*, No. 87 C 2097, 1990 WL 205454, *4 (N.D. Ill. Dec. 5, 1990)(Williams, J.)(granting summary judgment

10

holding individual liable for corporation's obligations to plaintiff on alter ego claim where defendant failed to provide sufficient evidence to create an issue of material fact on that point). Thus, the Court finds that Meier is personally responsible for repayment of the Note.

## B. Non-Payment of the Note Constitutes a Breach

Plaintiff also argues that the express, undisputed terms of the Note required Defendants to repay the $200,000 plus 8.5% interest on September 5, 1995. (Pl.'s App., Ex. 22.) Under New York law,[6] which governs the enforcement of the Note pursuant to its own terms a plaintiff seeking summary judgment must prove the existence of the note and the failure to make payments thereunder. *See First Interstate Credit Alliance, Inc. v. Sokol*, 179 A.D.2d 583, 584 (N.Y. App. Div. 1992) (affirming summary judgment on promissory note where no genuine issue of material fact prevented a finding that the note existed and no payments had been made). There is no dispute that Defendants failed to pay the Note in accordance with its terms. (Pl.'s App., Ex. 1 at 67-68.) Accordingly, no genuine issue of material fact prevents a finding that both defendants, Underwriters (the named party to the Note) and Meier (Underwriters' alter ego), breached their obligation under the terms of the Note.

## C. Plaintiff's Standing to Bring an Action Based on the Note

Defendants argue that, notwithstanding the undisputed facts regarding Meier's relationship to Underwriters and the failure to repay the Note, Plaintiff's summary judgment motion must fail

---

[6] Plaintiff correctly points out that in diversity actions like the present case, the forum state's choice-of-law rules apply to determine substantive law. *See Fulcrum Fin. Partners v. Meridian Leasing Corp.*, 230 F.3d 1004, 1011 (7th Cir. 2000). Because Illinois enforces contractual choice-of-law agreements similar to the one in the Note, New York law governs this issue. *See Home Ins. Co. v. Chicago & Northwestern Transp. Co.*, 56 F.3d 763, 766 (7th Cir. 1995).

and, in fact, summary judgment must be granted for Defendants. Defendants claim that Plaintiff has no standing to bring an action on the Note on Prestige's behalf because the Note had been transferred to Fargo prior to the entry of the Order of Liquidation. The proper party plaintiff, Defendants argue, is Fargo, the owner of the Note and a separate corporation that is still in existence. (Defs.' Mem. Supp. Summ. J. at 4-5.)

Federal Rule of Civil Procedure 17(a) requires that "every action shall be prosecuted in the name of the real party in interest." Both parties agree that, in an action brought under diversity jurisdiction, applicable state law must determine whether a party has standing to bring suit. *American Nat'l Bank v. Weyerhauser Co.*, 692 F.2d 455, 459-60 (7th Cir. 1982.) The parties are not clear about whether New York law (the choice of law stated in the Note) or Illinois law (the forum state, the source of Plaintiff's authority, and Prestige's home state) applies to this issue. Both parties cite both New York and Illinois law in arguing whether Plaintiff is the real party in interest with standing to bring this action against Defendants. As further discussed below, there is no "real" conflict of law, because the same result would apply under the law of either state. *See In re Air Crash Disaster Near Chicago, Illinois*, 644 F.2d 594, 605 (7th Cir. 1981).

Defendants cite *Nat'l Financial Co. v. Uh*, 279 A.D.2d 374 (N.Y. Sup. Ct. 2001), and § 3-201 of New York's version of the Uniform Commercial Code ("UCC"). New York's version of the UCC states that "[t]ransfer of an instrument vests in the transferee such rights as the transferor has therein . . ." and "[a]ny person who transfers an instrument transfers whatever rights he has in it." NY U.C.C. Laws § 3-201 (McKinney 2002) and cmt. 1; NY U.C.C. Laws § 3-104 (McKinney 2002)(promissory note is an "instrument" under the UCC). In *Nat'l Financial*, the plaintiff bank that had been declared insolvent by the State of New York sued on a note that was ultimately assigned

to the National Financial Company. 279 A.D.2d at 375. The defendant moved to dismiss the complaint for lack of standing. *Id.* The court held that when the note was assigned to the successor bank, the original bank was no longer the real party in interest, and dismissed the complaint. *Id.* Defendants further argue that "reverse veil-piercing" is disfavored under Illinois law. *See In re Rehabilitation of Centaur Ins. Co.*, 632 N.E.2d 1015, 1018 (Ill. 1994)(determining whether a corporation may bring an action against its own parent shareholder, thereby piercing its own corporate veil, and noting that "reverse piercing (where the parent company asserts that the subsidiary is not really a separate entity) is not favored.")

Plaintiff argues that the Order of Liquidation authorizes Plaintiff to "take immediate possession and control forthwith of the property, books, records, accounts, business, affairs, and other assets of the Defendant [Prestige]. . . and to marshall [sic] and liquidate the assets of Prestige . . . and to take such further action as the nature of this cause and the interests of Prestige's policyholders, stockholders and creditors." (Pl.'s App., Ex. 10 ¶ B.) Plaintiff claims (without supporting citation) that because Prestige wholly owns Fargo, Fargo's assets are among Prestige's "property, books, records, accounts, business, affairs, and other assets" referred to in the Order of Liquidation. Plaintiff argues further that the Note, whether accounted for now by Prestige or Fargo, represents Defendants' "dealings with" Prestige. *See* 215 Ill. Comp. Stat. § 5/193(3). Finally, Plaintiff argues that New York law also provides Plaintiff standing to sue on behalf of Fargo, citing *Waldbaum v. Finance Administrator of the City of New York*, 542 N.E.2d 1078, 1081 (N.Y. 1989)(parent company of a wholly owned subsidiary that is obligated to pay all the taxes on leased premises has standing to sue on behalf of the subsidiary).

Neither party has cited a case specifically addressing the situation presented here, *i.e.*,

13

whether the liquidator of an insolvent insurance company can enforce a note on the books of the insurance company's wholly-owned subsidiary. However, the general rule in the bankruptcy context is that, absent unusual circumstances, property of the debtor's subsidiary is not considered property of debtor by virtue of the debtor's sole ownership of the subsidiary. *In re Holywell Corp.*, 118 BR 876, 879 (S.D. Fla. 1990)(collecting cases). The Illinois Insurance Code, 215 Ill. Comp. Stat. §5/191 provides that the Director of Insurance in his capacity as liquidator of an insolvent insurance company is vested with title to "all property, contracts, and rights of action *of the company as of the date of the order* directing rehabilitation or liquidation." (Emphasis added.) The estate created by the liquidation consists of the liabilities and assets of the company being liquidated. *Id*. The Director as liquidator stands in the shoes of the insolvent company, and, under either New York or Illinois law a parent corporation cannot bring an action to recover damages incurred by a subsidiary.

> This conclusion follows from the principle that "a parent corporation cannot create a subsidiary and then ignore its separate corporate existence whenever it would be advantageous to the parent." Numerous courts have dismissed claims brought by corporations when the clams actually belong to a subsidiary or an affiliated corporation.

*Feinberg v. Katz*, 2002 WL 1751135, *4 (S.D.N.Y. July 26, 2002)(internal citations omitted.) In *Centaur Insurance Co.*, the Illinois Appellate Court held that the Director of Insurance as Rehabilitator could not sue the parent company of the insolvent insurance company, stating that, "[t]he corporate form may be disregarded only where equity requires the action to assist a third party." 606 N.E.2d at 296 (citing William M. Fletcher, *Encyclopedia of Corporations* Vol. 1, § 41.10, 615 (1990))(emphasis removed). If the remedy would not be available to the company, it is not available to the Director as Rehabilitator. *Id*.

Thus, it appears that Fargo is the real party in interest. Federal Rule of Civil Procedure 17(a)

provides that no action shall be dismissed on the ground that it is not prosecuted by the real party in interest until a reasonable time has been allowed for the joinder or substitution of the real party in interest. The real issue is whether summary judgment for Plaintiff on the Note should be delayed in order to require Fargo to substitute as the plaintiff. There is no reason to do so because the Court finds that Defendants have waived this issue.

As discussed above, this case was originally filed by the Liquidator of Prestige in 1998 in the Circuit Court of Cook County. On July 2, 1998, Defendants filed a Notice of Removal to the federal court on the basis of diversity jurisdiction. (Defs.' Notice of Removal at 2.) In that Notice, the Defendants informed the Court that diversity jurisdiction existed because the plaintiff, the acting Director of Insurance of the State of Illinois in his capacity as liquidator of Prestige, was diverse from Meier and Underwriters, citizens of Florida. (*Id.*) In June, 2000, at the direction of the Court, the Defendants filed an Amended Notice of Removal, again invoking diversity jurisdiction, and again informing the Court that diversity jurisdiction existed based on the fact that the plaintiff was the Director of Insurance, a government official of the State of Illinois. (Defs.' Exs., Ex. D at 2-3.) Defendants said nothing at either time to suggest in any way that Plaintiff lacked standing and was not the real party in interest.

Furthermore, Defendants' Answer and Counterclaim do not raise the issue. In fact, as Plaintiff points out, the first time that Defendants raised the issue was in their motion for summary judgment filed in January 2002, three and a half years after the case had been removed to the federal court. That is simply too late in this situation where the Defendants removed the case to the federal court four years ago on the basis of diversity between the Plaintiff and defendants (and filed an Amended Notice of Removal) without asserting their objection to Plaintiff, and there is no

15

suggestion that Defendants will be exposed to potential double liability. *United HealthCare Corp. v. American Trade Ins. Co.*, 88 F.3d 563, 569 (8ᵗʰ Cir. 1996)(defendant waived right to have subsidiary substituted for plaintiff parent corporation where defendant waited two years to make argument); *Allegheny Intel, Inc., v. Allegheny Ludlum Steel Corp.*, 40 F.3d 1416, 1431 (3ᵈ Cir. 1994)(defendant waived right to require successor to seller to be substituted as plaintiff where defendant waited until filing of motion for summary judgment).

Although Defendants' Statement of Facts asserts that "[o]nly after plaintiff commenced this action did defendants discover that ownership of the Note had been assigned from Prestige to Fargo in June 1993," there is nothing in the record to support that assertion. The exhibits cited by Defendants in support of that statement (Defs.' Exs., Exs. N, O), refer to the transfer of the Note, but do not demonstrate that the transfer was concealed from Meier or his alter ego Underwriters. On the contrary, as Plaintiff points out, Meier was a 1/11th owner of Prestige, which was the sole shareholder of Fargo, and Meier was a director of both companies. (Pl.'s Resp. ¶ 17.) Significantly, Defendants' papers do not state when they found out that the Note had been transferred. They do *not* state that Defendants did not know of the 1993 transfer before the filing (in 1998) of the Notice of Removal or the filing of the Amended Notice of Removal (in 2000). There is nothing in the record to suggest that Defendants could not have known before those dates.

Plaintiff asserts that he is seeking to collect on the Note as part of his obligation to marshal the assets of Prestige. (Pl.'s Resp. Defs.' Mem. at 1.) It is undisputed that Fargo's Board of Directors currently consists of agents of Plaintiff, the Liquidator of Prestige. (Defs.' Exs., Ex. P at 48.) Thus, the risk that Defendants will be exposed to a claim by Fargo to collect the same indebtedness is negligible, and Defendants do not argue otherwise. Thus, Defendants' effort to

16

forestall the entry of judgment on Count I on the basis of their tardy assertion that Fargo is the proper

party plaintiff is rejected, and the objection is deemed waived. Defendants' motion for summary

judgment based on Plaintiff's claimed lack of standing to bring a claim based on the Note is,

therefore, denied.

### D. Whether Meier's Affirmative Defense of Set Off Arising Out of the Call Option Agreement Prevents Judgment for Plaintiff on the Note

Meier also argues that summary judgment is improper because numerous issues of disputed

fact exist with regard to his affirmative defense of setoff.[7] Meier argues that Plaintiff's failure to

honor the Call Option Agreement benefitted Prestige to a value of $700,000 and that this benefit

entitles Defendants to compensation against which any liability on the Note should be setoff. (Defs.'

Mem. Opp'n at 5.) Defendants cite no authority to support their argument that Meier's affirmative

defense of setoff prevents summary judgment for Plaintiff on the Note.

Plaintiff argues that the defense of setoff does not preclude summary judgment on the Note

because it is not based on the Note, but rather arises out of the Call Option Agreement, a separate

and distinct contract. Plaintiff cites New York law for this proposition. In *Logan v. Williamson &

Co.*, 64 A.D.2d 466, 470 (N.Y. App. Div. 1978), the court held that a plaintiff's motion for summary

judgment on a promissory note should not be denied where the "defendant asserts a cause of action

on a related but independent and unliquidated counterclaim, one arising out of the same general

transaction but one which does not constitute a defense to plaintiff's cause of action." *See also*

---

[7] In their papers, the Defendants had also raised the affirmative defenses of estoppel and laches to Plaintiff's claims on the Note. In its reply, however, Plaintiff noted that, in their Answer to the Amended Complaint, Defendants did not raise the affirmative defenses of estoppel and laches in response to Count I, but rather to Count IV, which alleged unjust enrichment. (Pl.'s Reply at 10 n.3.) At oral argument, counsel for Defendants withdrew its arguments relating to estoppel and laches and, accordingly, this opinion will not address them.

*Vinciguerra v. Northside Partnership*, 188 A.D.2d 861, 863 (N.Y. App. Div. 1992)(granting summary judgment to holder of note and severing counterclaim based on a separate contract, even if the note and the other contract were in essence a single transaction); *Miller v. Steloff*, 686 F. Supp. 91, 93-94 (S.D.N.Y. 1988)(granting summary judgment on note where the note was "an agreement unto itself" despite evidence and claims relating to prior or contemporaneous documents related to the note).

Here, the Note is a separate agreement that contains an integration clause. There is no dispute about its terms, and there is no dispute that it does not reference the Call Option Agreement. Thus, under New York law as set forth above, even assuming that the Call Option Agreement was part of the same general transaction that gave rise to the Note, Defendants' claims arising out of the separate and distinct Call Option Agreement do not preclude summary judgment on Plaintiff's claim on the Note.

Applying Illinois law would have the same result. *Echo, Inc. v. Whitson Co., Inc.*, 52 F.3d 702, 708 (7th Cir.1995)("Each party's rights have their origins in different contracts, and we have determined that such a state of affairs precludes set-off."). Moreover, the courts in this District have refused to allow the possibility that the defendant might recover on a counterclaim brought under a separate contract to preclude summary judgment for the plaintiff on the plaintiff's claim. *See, e.g.,* *Echo, Inc.*, 52 F.3d at 704, 708 (affirming summary judgment entered by Judge Zagel); *Old World Trading Co., Inc. v. Nat'l Steel Corp.*, No. 88 C 4621, 1989 WL 4212, *3 (N.D. Ill. Jan. 19, 1989)(Aspen, J.)(granting summary judgment for plaintiff).

Thus, summary judgment is granted in favor of Plaintiff and against both Defendants on Count I of Plaintiff's Complaint. This judgment effectively disposes of Meier's affirmative defense

18

of set-off; however, it is without prejudice to Meier's counterclaim based on the Call Option Agreement, which is discussed below.

## II. PLAINTIFF'S MOTION FOR SUMMARY JUDGEMENT ON MEIER'S COUNTERCLAIM BASED ON THE CALL OPTION AGREEMENT

Plaintiff next argues that it is entitled to summary judgment in his favor on all Counts of Meier's counterclaim. Meier's counterclaim asserts four Counts: Tortuous interference with contract (Count I); unjust enrichment (Count II); conversion (Count III); and fraudulent transfer (Count IV). These claims arise out of Meier's assertion that the Call Option Agreement gave him a right to re-acquire the 100,000 shares of Columbia Lab shares. Plaintiff contends that the Call Option Agreement is not a valid and enforceable contract and, as such, Meier's claims arising therefrom must fail. *See Celotex*, 477 U.S. at 323 ("failure of proof concerning an essential element of the [nonmovant's] case necessarily renders all other facts immaterial.").

### A. Is the Call Option Agreement Authentic?

Plaintiff's first line of attack against Meier's claims arising out of the Call Option Agreement argues that the Agreement cannot be authenticated. Specifically, Plaintiff claims that, although the Agreement contains a signature line for "Fargo Acceptance Company/ By" which has a handwritten notation "Lisa Gisler, Vice President," the evidence establishes that Lisa Gisler did not, in fact, sign the Call Option Agreement. In her deposition, Gisler stated that she had never seen the Call Option Agreement or the cover letter she allegedly signed; that she could not say for certain whether the signature on the document was hers; and that the cover letter was not printed on letterhead she would have used. (Pl.'s App., Ex. 2 at 25-28.) Further, Plaintiff argues that Fargo's company records reflecting election of corporate officers do not support a finding that Gisler was a vice president at

the time the Agreement was signed (September 30, 1992), and, in fact demonstrate that she was not elected vice president until December 15, 1992. (Defs.' Resp. ¶¶ 47-49; Pl.'s App., Exs. 13, 19.) Moreover, Plaintiff argues that deposition testimony, including Gisler's, establishes that signing such contracts on behalf of Fargo was never part Gisler's job description. (Pl.'s App., Ex. 2 at 31-32; Ex. 4 at 22-25, 56-57.)

Plaintiff also claims that it did not learn of the existence of the Call Option Agreement until 1997, and points to evidence in the record indicating that the Call Option Agreement was not found in the books and records of Fargo. (Pl.'s App., Ex. 6 at 98-99, 127-28). Plaintiff also argues that the evidence establishes that the agreement was unfamiliar to some of the officers and directors of the corporation. At his deposition, for example, Norman Koefoed, the president of Fargo from December 15, 1992 until May 6, 1994, stated that he did not think he ever had knowledge of the Agreement's existence, and that he did not recognize Gisler's signature or recall whether she was vice president of Fargo at that time. (Pl.'s App., Ex. 3 at 69-71.) Finally, Plaintiff finds further support for its assertion that it did not know about the Call Option Agreement by virtue of the fact that in December 1992, Koefoed represented that no outside agreements existed between investors in Prestige (including Meier) and its affiliates. (Pl.'s App., Ex. 26 ¶ 2.)

Plaintiff relies on *Pellegrini v. Chicago Great Western Railway Co.*, 319 F.2d 447, 455 (7th Cir. 1963). In *Pellegrini*, the court held that the trial court had erred in admitting a medical report where the doctor who was purported to have written the report testified that he did not sign the report, could not say it was his handwriting, knew nothing about the report, did not recall and had no record of treating the plaintiff, and had no practice of incorporating his medical findings in the form of the exhibit. *Id.* The *Pellegrini* court stated that with such an "uncertain and negative

foundation," the exhibit was admitted erroneously. *Id. See also Nachtsheim v. Beech Aircraft Corp.*, 847 F.2d 1261, 1271-73 (7th Cir. 1988)(affirming on abuse of discretion standard trial court's redaction of portion of incident report where the witness testified that he was not the author).

Meier counters that sufficient evidence exists to create a genuine issue of material fact with regard to the authenticity of the Call Option Agreement. Specifically, Meier points to Gisler's testimony that, although she stated that she had never seen the Agreement, she also stated that she did not recall signing it. (Pl.'s App., Ex. 2 at 25, 28.) Gisler also testified that the signature on the Call Option Agreement "looks like" hers, and that, although it was not her practice to sign documents generally or with the notation "vice president" after her signature, she might have done so if she had been asked. (*Id.* at 27-28.)

Meier also distinguishes *Pellegrini* on the grounds that, in that case, the doctor was the sole witness who could authenticate the document. *Pellegrini*, 310 F.2d at 455. In this case, Meier argues, other witnesses can authenticate the document. Meier points to the testimony of Shephard Lane, Meier's counsel, who testified that he supervised the execution of the Agreement and personally witnessed the signatures of Gisler, Meier and Kidd, which appear on the Call Option Agreement. (Pl.'s App., Ex. 8 at 52-53.) Also, Douglas Greenwood, an employee of Prestige and/or Fargo from August 1981 through October 1994 testified that the signature on the Call Option Agreement "looks like" Gisler's, even though he was unable to state definitively whether it was hers. (Pl.'s App., Ex. 4 at 100.) Under these circumstances, Meier argues, the foundation for the Call Option Agreement is not as "negative and uncertain" as the foundation for the document considered in *Pellegrini*.

Applying the standards for summary judgment discussed above, Meier has presented

sufficient evidence to preclude a finding that the Call Option Agreement is incapable of authentication. The deposition testimony and other evidence cited by both parties indicates the determination whether Gisler signed the document is an issue for the trier of fact.

### B. Did Gisler Possess Authority to Bind Fargo to the Call Option Agreement?

Plaintiff's next attack against Meier's claims arising out of the Call Option Agreement focuses on whether Gisler possessed the authority to bind Fargo to such an agreement. First, Plaintiff argues that the record establishes that Gisler was not a vice president of Fargo as of September 30, 1992, and was not made a vice president until December 15, 1992. (Defs.' Resp. ¶¶ 45-49.) Second, even if Gisler were vice president at the time the Call Option Agreement was executed, she did not have the authority in that capacity to bind Fargo to such an "unusual and extraordinary" contract because her duties were largely clerical and administrative and did not involve signing or negotiating contracts. (Pl.'s App., Ex. 4 at 22-25, 56-57; Ex. 3 at 85-87.)

Meier ultimately has the burden of proving that Gisler had authority to execute the Call Option Agreement on Fargo's behalf. *Sacks v. Helene Curtis Indus., Inc.*, 91 N.E.2d 127, 131 (Ill. App. Ct. 1950)("It is well settled that one dealing with an agent of a corporation has the burden of proving the agent's authority to bind the principal to the particular contract on which he rests his claim."). The authority of an agent, "whether express or implied, inherent or apparent, must stem from the words or actions of his principal. If the principal is a corporation, that means that the agent's authority must be traceable, directly or indirectly, to the corporation's board of directors." *Rouse Woodstock, Inc. v. Surety Federal Sav. and Loan Assn.*, 630 F. Supp. 1004, 1010 (N.D. Ill. 1986). "Apparent authority may exist when a principal, by words or conduct, holds out an agent as

22

possessing certain authority and thereby inducing others to believe that authority exists." *Anetsberger v. Metropolitan Life Ins. Co.*, 14 F.3d 1226, 1235 (7th Cir. 1994.) The authority of an agent acting on behalf of an agent may derive from an express grant of authority from the board of directors or impliedly, through the board's having placed the individual in a corporate office or position which carries the inherent authority to act for the corporation in certain transactions. *Evanston Bank v. Conticommodity Services, Inc.*, 623 F. Supp. 1014, 1030-31(N.D. Ill. 1985)(discussing inherent authority of an agent). Although a contract may be so unusual and extraordinary that no officer of a corporation can be deemed to have inherent authority to bind the company to it, "[t]he question of what is unusual or extraordinary is normally one for the trier of fact, since it depends on the facts and circumstances of the business, the officer's position and the specific transaction." *Evanston Bank*, 623 F. Supp. at 1032. In order to defeat summary judgment, Meier must produce enough evidence so that a reasonable jury could conclude that Gisler had authority to bind Fargo to the Call Option Agreement. *See Intl. Union of Operating Eng'rs, Local 150 v. Triad Constr. Servs., Inc.*, No. 97 C 6218, 1999 WL 571053, *5 (N.D. Ill. July 29, 1999)(Schenkier, M.J.).

Meier claims that the corporate records of Fargo do not conclusively establish that Gisler was *not* a vice president of Fargo at the time of the execution of the Call Option Agreement. Apparently Fargo's records regarding the election of its officers and directors prior to September 29, 1992 are missing. (Defs.' Resp. ¶¶ 46-49.) Meier acknowledges that the minutes from a meeting on September 29, 1992 indicate that Kenneth Levy had been elected vice president (Pl.'s App., Ex.13); however, Meier argues that those minutes do not establish conclusively that Levy was the only vice president at that time. (Defs.' Resp. ¶¶ 46-49.) Moreover, Gisler testified that she could not recall the exact date on which she became vice president; that she "ran the company [Fargo];" and that her

job responsibilities did not change between her hiring in April 1992 until her departure in 1994. (Pl.'s App., Ex. 2 at 10, 27; Defs.' App., Ex. 13 at 34-36.) Thus, Meier argues, the fact that corporate records reflect that Gisler was elected vice president in December 1992 (following the September 30, 1992 change of ownership) does not preclude a finding that she acted in that capacity prior to that date. (Defs.' Mem. Opp'n at 14.) Finally, Meier's counsel, Shephard Lane, testified that on the date that the Call Option Agreement was executed, Sam Hakemian, who then owned the company and the capital stock of Fargo and constituted the entire board of directors of Fargo, personally informed him that Gisler was the "vice president of Fargo to execute this document," and directed Gisler to sign it. (Pl.'s App., Ex. 8 at 54-55; Ex.13.)

Again, under the standard applicable to summary judgment, Meier has demonstrated that there is a genuine issue of material fact such that, construing the evidence in the light most favorable to them, a reasonable jury could conclude that Gisler had authority to bind Fargo to the Call Option Agreement. It will be for the finder of fact to decide whether Lane's testimony is credible and whether the other evidence is sufficient to prove that Gisler acted within the scope of her authority and whether the Call Option agreement was not such an "unusual and extraordinary" contract as to be outside the scope of her authority to bind Fargo.

## C. Did Corrective Order No. 01-93 Bar Enforcement of the Call Option Agreement?

Plaintiff's third argument to defeat Meier's claims arising out of the Call Option Agreement is that Fargo's performance under the Agreement was made impossible as a matter of law by Corrective Order No. 01-93, which the Illinois Department of Insurance issued on February 4, 1993 with respect to Prestige. As stated above, Corrective Order 01-93 required that Prestige "take

24

whatever measures necessary to ensure that Fargo does not sell, transfer, trade, convert or otherwise dispose of the 350,000 shares of Columbia Laboratories, Inc. common stock held in Fargo's name, regardless of whether such actions may be required by prior agreement, *without the prior express written permission of the Director or his designee.*" (Pl.'s App., Ex. 32 ¶ 2, emphasis added.)

Plaintiff relies on *Commonwealth Edison Co. v. Allied-General Nuclear Servs.*, 731 F. Supp. 850, 853-54 (N.D. Ill. 1990) which dealt, *inter alia*, with whether a moratorium on commercial reprocessing imposed by the Nuclear Regulatory Commission in 1977 was a force majeure event that discharged the defendant's duty to perform under a contract requiring the defendant to be ready to process fuel by a certain date except for certain reasons, including force majeure. The court stated that "[o]rdinarily when performance of a contract would be illegal because of a statute, regulation, or other official action that has occurred since the contract was signed, the promisor is discharged without liability, pursuant to the common law doctrine of impossibility." *Commonwealth Edison*, 731 F. Supp. at 855.

Plaintiff argues that the Corrective Order is just such an "official action" that would make it impossible for Fargo to sell the Columbia Lab shares back to Meier and, thus, discharges Plaintiff from liability. (Pl.'s Mem. in Supp. Summ. J. at 18-19.) Moreover, Plaintiff argues that Fargo was not in a position to require the Director to permit it to sell the shares of Columbia Lab stock when such a sale at a discount price ($7.35 per share pursuant to the Call Option Agreement versus $19.35 per share on the open market as of July 31, 1997) would fail "to protect the interests of Prestige's policyholders and creditors, and the public," as the Director is required to do under the Order of Liquidation. (Pl.'s App., Ex. 10.)

Meier disagrees with Plaintiff's interpretation of the Corrective Order. Meier focuses on the

language of the Corrective Order that precludes Fargo from transferring stock without the approval of the Director of Insurance. (Pl.'s App., Ex. 32 ¶ 2.) Meier argues that the requirement of the Director's approval does not and cannot amount to an absolute ban on the transfer of the Columbia Lab shares because the language of the Corrective Order indicates that Fargo had some ability to obtain the Director's permission and thereby remove the obstacle to performance. *See Felbinger and Co. v. Traiforos*, 394 N.E.2d 1283, 1289 (Ill. App. Ct. 1979)("Legal impossibility does not excuse performance as long as it lies within the power of the promisor to remove the obstacle to performance."). The *Felbinger* court noted that "neither the insolvency of the promisor, the institution of bankruptcy proceedings, nor the appointment of a receiver will legally discharge one from a duty to perform," and held that institution of mortgage foreclosure proceedings due to defendant's default did not discharge him from performing on an exclusive right to sell agreement. *Id.*

Neither party has cited authority directly on point. Moreover, neither party has discussed whether the Corrective Order (which prescribes actions in an attempt to thwart liquidation) was still effective once Prestige actually entered liquidation in 1994 or when Meier attempted to exercise his rights under the Call Option Agreement in 1997. In any event, for purposes of Plaintiff's motion for summary judgment, Meier presents the more persuasive argument. Because Corrective Order No. 01-93 specifically states that a transfer of the Columbia Lab shares could take place upon the express written permission of the Director, it does not appear on its face to make the Call Option Agreement illegal or impossible for Fargo to perform. As Plaintiff acknowledges, after the Order of Liquidation was entered, the Director made decisions in accordance with what was in the best interest of Prestige's policyholders, creditors and/or the public. However, the Plaintiff has shown nothing to

26

demonstrate that as Liquidator he would have been prohibited by law from honoring the Call Option Agreement, had he decided to do so. Accordingly, summary judgment on the ground of legal impossibility is inappropriate.

### D. Are Meier's Claims Based on the Call Option Agreement Barred by Waiver or Equitable Estoppel?

Plaintiff's fourth attack on Meier's claims arising out of the Call Option Agreement is that those claims are precluded by the principles of waiver and/or estoppel. Specifically, Plaintiff charges that Meier waived and/or is estopped from enforcing the Call Option Agreement for two reasons: (1) because he kept the existence of the agreement secret; and (2) because he kept silent about his rights under the contract when he was informed in an October 18, 1994 letter that Plaintiff planned to sell the Columbia Lab shares on the open market. (Pl.'s Mem. in Supp. Summ. J. at 19.)

Waiver is the voluntary intentional relinquishment of a known right, claim or privilege. *Horbach v. Kaczmarek*, 915 F. Supp. 18, 23 (N.D. Ill. 1996)(quoting *City of Chicago v. Michigan Beach Housing Cooperative*, 609 N.E.2d 877, 887 (Ill. App. Ct. 1993)); *Wald v. Chicago Shippers Assn.*, 529 N.E.2d 1138, 1147 (Ill. App. Ct. 1988). Waiver may arise either expressly or from conduct inconsistent with an intent to enforce that right. *Id.* "Where there is no dispute as to the material facts and only one reasonable inference can be drawn therefrom, it is a question of law whether the facts proved constitute waiver." *Wald*, 529 N.E.2d at 1147-48.

Under the doctrine of equitable estoppel, "where one party fails to assert a contract right and the other party construes the silence as consent and changes position thereon, the party who remained silent is estopped to assert that contractual right later." *Peoria Sav. & Loan Assn. v. American Sav. Assn.*, 441 N.E.2d 853, 857 (Ill. App. Ct. 1982). The focus in evaluating an equitable estoppel claim

27

is not on the obligor's intent, but rather the effect of his or her conduct on the obligee. *Wald*, 529 N.E.2d at 1148. To prevail on a claim of equitable estoppel, a party must show by clear and unequivocal proof that he relied on some acts or representation of the other party and had no knowledge or convenient means of knowing the true facts. *Id.*

Plaintiff argues that Meier's silence effected a waiver of his alleged rights under the Call Option Agreement. Plaintiff also claims that this same silence induced or encouraged Plaintiff unknowingly to breach the Call Option Agreement by selling the Columbia Lab shares on the open market such that Meier should be equitably estopped from asserting any rights under the agreement. Specifically, Plaintiff argues that, prior to his formal request to exercise his rights under the Call Option Agreement, Meier failed to disclose the existence of the agreement and stood by silently in the face of a statement by Plaintiff's counsel in a letter dated October 18, 1994 that the Liquidator intended to sell the stock. (Pl.'s App., Ex. 35.) Plaintiff claims that this statement was nothing short of notice to Meier that the Liquidator intended to act in a way that would infringe upon Meier's rights under the Call Option Agreement. (Pl.'s Reply at 21.) Further, Plaintiff claims that equitable estoppel is appropriate because a December 17, 1992 letter from Koefoed to the Department of Insurance stated that no agreements existed "between the eleven (11) investors and Prestige or any affiliate." (Pl.'s App., Ex. 26 ¶ 2.)

Meier raises both factual and legal arguments in opposition to Plaintiff's argument. First, Meier disputes that the factual record supports summary judgment for Plaintiff. He denies that Plaintiff did not know about the Call Option Agreement and that he (Meier) kept silent regarding his rights under the agreement prior to his attempt to exercise those rights in 1997. First, Meier claims that the statement in the October 1994 correspondence from Plaintiff's counsel–that the Liquidator

had concluded that "the Prestige estate would be better served by seeking to sell the stock on the open market"–did not give him (Meier) notice that the Liquidator actually intended imminently to sell the Columbia Lab shares on the open market. (Pl.'s App., Ex. 35.) Meier claims that the letters were exchanged in the context of negotiations, and that he had no reason to believe that Plaintiff's statement evinced an intent to breach the Call Option Agreement. Moreover, Meier claims that he did not remain silent about his rights under the agreement during the October 1994 negotiations; that his statement that he would "continue to explore financial avenues towards [sic] obtaining back some or all of the shares" impliedly included the exercise of his rights pursuant to the Call Option Agreement. (Pl.'s App., Ex. 36.)

Meier's counsel Shepard Lane testified to his "recollection" that a copy of the Call Option Agreement was shown to the Department of Insurance at a meeting in October 1992, and that the Department representatives made copies of everything that was brought to the meeting. (Defs.' App., Ex. 6 at 26-27.) Meier also points to handwritten notes produced by the Department of Insurance to bolster his claim that the Department was aware of the Call Option Agreement long before Meier attempted to exercise his rights thereunder in 1997. The first set of notes is taken from Department records dated April 27-28, 1993, referring to the Meier and Kidd promissory notes and containing a notation to "ask Lane or Meier for correct option info." (Defs.' App., Ex. 10 at DOI 1121, 1123-24.) The second set of notes appear to be attached to a July 15, 1993 meeting agenda, and contain the following notations: "Col[umbia] shares – Lane – never intent to take [money] out of Prestige No benefit to Kidd or Meir [sic] from taking [money] out . . . Co. agreed not to move Col[umbia] Labs stock out of Fargo via Corrective Order." (Defs.' App., Ex. 11 at DOI 1729.) Finally, Meier claims that Corrective Order No. 01-93 refers to the Call Option Agreement in its

requirement that Fargo not sell or transfer the Columbia Lab shares without the Director's permission regardless of any "prior agreement" to the contrary. (Pl.'s App., Ex. 32 ¶ 2.)

As a matter of law, Meier argues that Plaintiff's defenses of waiver and estoppel should be disregarded because Plaintiff failed to raise those defenses in its Answer to Meier's counterclaim. (Defs.' App., Ex. 7.) Federal Rule of Civil Procedure 12(b) states that "[e]very defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim shall be asserted in the responsive pleading thereto if one is required." Further, Federal Rule of Civil Procedure 8(c) requires that "a party shall set forth affirmatively . . . estoppel . . . [and] waiver" in response to a preceding pleading. Plaintiff's reply does not address this argument.

Failure to plead an affirmative defense pursuant to Rule 8(c) can result in waiver of that defense. *Bank Leumi Le-Israel, B.M., v. Lee,* 928 F.2d 232, 235 (7th Cir. 1991)(finding waiver of affirmative defense where party failed to raise the issue in the district court). It is unnecessary to decide whether Plaintiff has waived these affirmative defenses, or, even at this late date, could seek leave to amend his Answer. *See* Fed. R. Civ. P. 15(a). The matter presently before the Court is Plaintiff's motion for summary judgment on Meier's counterclaim. Plaintiff has cited no authority to support granting summary judgment on the basis of a defense that has not been pleaded.

Furthermore, the evidence to which Meier has pointed must be viewed in the light most favorable to him. Viewed in this light, a genuine issue of material fact exists as to whether Plaintiff, through his counsel or through the Department of Insurance, was aware of Meier's claim of rights arising from the Call Option Agreement and was not mislead into acting to the Plaintiff's detriment. Thus, Plaintiff's motion for summary judgment on the basis of waiver or estoppel is denied.

30

**E.     Whether the Principles of the *D'Oench Duhme* Decision Bar Meier from Asserting Rights Under the Call Option Agreement.**

Plaintiff's final argument against Meier's counterclaim and defenses arising out of the Call Option Agreement is that the agreement was an unrecorded and secret side agreement to the Contribution Agreement and the Note.   Under the principles underlying the Supreme Court's decision in *D'Oench, Duhme & Co., Inc. v. FDIC*, 315 U.S. 447 (1942), Plaintiff argues, unrecorded or undisclosed "side" agreements that alter the terms of recorded notes or obligations that had been given to banks or insurance companies to enhance their financial solvency cannot be enforced against the liquidators or receivers of those institutions.  (Pl.'s Mem. in Supp. Summ. J. at 24.)  *See also Niblack v. Farley*, 122 N.E. 160, 162 (Ill. 1919)(defendant estopped from denying liability on a note where, by defendant's own statement, note had been given to bank for the purpose of making an appearance of assets and perpetrating a fraud on the bank examiner and creditors). Plaintiff argues that the Call Option Agreement is just such a secret and unrecorded side agreement.

Although it is apparently undisputed that the Call Option Agreement does not appear in Fargo's corporate books and record, Meier points to the ambiguous state of Fargo's records (Defs.' Resp. ¶ 50), and the other evidence discussed above, which Meier argues, demonstrates that the Call Option Agreement was disclosed and not a fraud.  (Defs.' Mem. Opp'n at 24.)

At the outset, there are a number of issues regarding the applicability of *D'Oench, Duhme* here.  The narrow holding of the *D'Oench, Duhme* decision is that the maker of a note that is given to a bank for the purpose of bolstering the bank's apparent assets may not assert as a defense in an action by the FDIC on the note an unrecorded side agreement that the note was given for no consideration and is unenforceable.  Because the lawsuit was brought by the FDIC pursuant to federal statute, the Supreme Court determined that federal law, not state law, would govern.  315

U.S. at 455-456. The decision was based on the federal policy to protect the FDIC from misrepresentations made to induce or influence its actions. *Id.* at 459.

This description demonstrates that there are significant differences between the side agreement involved in *D'Oench, Duhme* and the Call Option Agreement. The Call Option Agreement does not express an intention to nullify the Note or its obligations. The Call Option obligated Fargo to retain the shares for five years, and gave Meier and Kidd a continuing right during those five years to reacquire the shares at a price equal to 40% over the market price of the shares on September 30, 1992 at any time that the market value was at or above the option price. As discussed above, the Call Option Agreement is a separate agreement that at most gives rise to a counterclaim but does not affect the Defendants' obligation on the Note.

Furthermore, the *D'Oench, Duhme* decision was based on federal law policy, and has been applied by federal courts only in the context of FDIC insurance of, or loans to, banks. The viability of *D'Oench, Duhme* as a matter of federal law has been questioned. The Eighth, Third and D.C. Circuits have read subsequent Supreme Court cases as overruling *D'Oench, Duhme*, and the Ninth Circuit has found the scope of *D'Oench, Duhme* to be severely limited. *See DiVall Insured Income Fund Ltd. Partn. v. Boatmen's First Natl. Bank of Kansas City*, 69 F.3d 1398, 1402 (8th Cir. 1995); *FDIC v. Deglau*, 207 F.3d 153, 170-171 (3d Cir. 2000); *Murphy v. FDIC*, 61 F.3d 34, 40 (D.C. App. 1995); *Ledo Fin. Corp. v. Summers*, 122 F.3d 825, 829 (9th Cir. 1997). While the doctrine has not been expressly disclaimed by the Seventh Circuit, that court has noted that "several recent cases have suggested that the common law *D'Oench Duhme* doctrine did not survive" subsequent statutes. *Hillman v. RTC*, 66 F.3d 141, 143 n.2 (7th Cir. 1995). In the banking context, 12 U.S.C. § 1823(e), enacted subsequent to *D'Oench, Duhme*, dictates that the only agreements enforceable against

regulators are those "that are in writing and have been official records of the bank since their execution." *FDIC v. Rayman*, No. 92 C 3688, 1995 WL 505960, *1 n.1 (N.D. Ill. August 23, 1995)(Norderberg, J.).

Because the present action is brought by the Liquidator of an insolvent insurance company and is based on state law, Plaintiff argues for the extension of *D'Oench, Duhme* to cover this case by drawing parallels between the public policies behind regulation of banks and insurance companies. Plaintiff also cites two state court cases where similar policies have been enforced in actions relating to insolvent insurance companies, one from Texas (*Wheeler v. American Natl. Bank of Beaumont*, 347 S.W.2d 918 (Tex. 1961)), the other from Kentucky (*In re Nichols, Liquidator v. Glogower*, No. 90-CI-01207-AP-007 (Cir. Ct. Ky. April 13, 2000)).

The *Wheeler* decision does not even refer to the *D'Oench, Duhme* decision. Instead, the Texas Supreme Court held that the receiver of the insolvent insurance company could maintain an action against banks that had entered into fictitious loan transactions with the insurance company so that the company could represent that it had required surplus. On the basis of general equitable principles, the banks were estopped to deny that the banks actually owned the sums. 347 S.W.2d at 922. In *Nichols*, the Court refused to consider an alleged *oral* side agreement as a defense to the Liquidator's enforcing several notes, both on general equity principles and on the basis of the parol evidence rule.

Here, Plaintiff is asking not only that the *D'Oench, Duhme* decision be expanded from banking to the field of insurance, but that it be held to prohibit as a matter of law the enforcement against the Liquidator of any agreement entered into by an insurance company that does not appear on the insurance company's books and records. Neither *D'Oench, Duhme* nor the other cases cited

by Plaintiff go that far. Instead, they rely on equitable principles, which in turn rely on the facts of the case. As noted above, Plaintiff has not pled any equitable defenses to Meier's counterclaim. In the absence of any authority to support Plaintiff's expansive reading of the *D'Oench, Duhme* decision, summary judgment for Plaintiff must be denied.

## CONCLUSION

For the reasons stated above, the Plaintiff's motion for partial summary judgment [dkt 58] is granted in part and denied in part. Plaintiff's motion for summary judgment on Count I of the Amended Complaint is GRANTED. Plaintiff's motion for summary judgment on Defendants' counterclaim is DENIED. Defendants' motion for summary judgment [dkt 54] is DENIED.

**IT IS SO ORDERED.**

**GERALDINE SOAT BROWN**
**United States Magistrate Judge**

**DATED: September 26, 2002**